**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Robert Allen (N-03705), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13 C 0146 |
| v. | ) | |
| | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Partha Ghosh, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert Allen (hereinafter, "the plaintiff"), an Illinois prisoner confined at
Stateville Correctional Center, brought this 42 U.S.C. § 1983 lawsuit alleging deliberate
indifference to his serious medical needs in regard to the treatment of his testicular pain.
Currently before the Court are two motions for summary judgment, one from Dr. Imhotep
Carter, who formerly served as medical director at Stateville, and one from the other medical
defendants, Dr. Parthasarathi Ghosh, a former medical director at Stateville; Dr. Saleh Obaisi,
the current medical director at Stateville; Adrienne Downs-Miller, a nurse at Stateville; and
Wexford Health Sources, Inc., the state's contracted provider of prison health services
(collectively, "Wexford Defendants").[1] Also before the Court is the plaintiff's "Affidavit
Pursuant to Fed. R. Civ. P. 56(d)," which the Court interprets as a motion for additional

---

[1] The complaint, filed in January 2013, named an additional defendant employed by
Wexford, Dr. Liping Zhang, who left Wexford in 2010. The Court previously granted summary
judgment to Dr. Zhang on statute of limitations grounds. (Dkt. No. 64.)

discovery pursuant to Fed. R. Civ. P. 56(d). For the reasons stated herein, the Court denies the plaintiff's motion for additional discovery, and grants both motions for summary judgment.

## BACKGROUND

### I.    Northern District of Illinois Local Rule 56.1

Because the plaintiff is now a *pro se* litigant,[2] both sets of defendants served him with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" as required by Northern District of Illinois Local Rule 56.2. (Dkt. Nos. 122, 123.) The notice explains the consequences of failing to properly respond to a motion for summary judgment and statement of material facts under Federal Rule of Civil Procedure 56 and Local Rule 56.1.

Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal citation omitted). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied

_____

[2] Previously, the plaintiff was represented by two different attorneys in this case, one retained and one recruited by the Court following the withdrawal of the plaintiff's retained counsel. Both attorneys ultimately were given leave to withdraw after determining that they reported to the Court that they could not continue to press the plaintiff's claims consistent with their obligations under Fed. R. Civ. P. 11. (*See* Dkt. Nos. 83, 114.)

upon.'" *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)). Local Rule 56.1(b)(3)(C) requires the nonmoving party to present a separate statement of additional facts that requires the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon to support the statement of additional facts. *See Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008).

The purpose of Local Rule 56.1 statements and responses is to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant facts and the way they propose to support them." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012). The local rule requires the parties to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (holding that *pro se* plaintiff's statement of material facts did not comply with Rule 56.1 as it "failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture."). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Cracco*, 559 F.3d at 632; *see also Frey Corp. v. City of Peoria, Ill.*, 735 F.3d 505, 513 (7th Cir. 2013).

Consistent with the Local Rules, both sets of the defendants filed Local Rule 56.1(a)(3) Statements of Material Facts with their summary judgment motions. (Dkt. Nos. 94, 99.) Although he has been given ample opportunity to do so (*see* Dkt. Nos. 112, 116, 121), the plaintiff did not submit responses to these factual assertions as required by Local Rule 56.1(b)(3). Instead, he submitted an affidavit which the court interprets as a motion brought pursuant to Fed. R. Civ. P. 56(d). That rule provides in relevant part: "If a nonmovant shows by

affidavit or declaration that, for specified reasons, [he] cannot present essential facts to justify [his] opposition" to a motion for summary judgment, the Court may deny the motion, allow additional time for discovery, or issue any other appropriate order. Fed. R. Civ. P. 56(d). The rule places the burden on the party that believes additional discovery is necessary to "'state the reasons why the party cannot adequately respond to the summary judgment motion without further discovery.'" *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 628 (7th Cir. 2014) (quoting *Deere & Co. v. Ohio Gear*, 462 F.3d 701, 706 (7th Cir. 2006)).

The plaintiff states in the affidavit that he is functionally illiterate and needs the assistance of other prisoners to communicate with the Court. The plaintiff states that he suffered testicular pain for six years "without any help from defendants in spite of being reduced to tears, unable to walk, and constent [sic] please [sic] for help." The plaintiff contends that he cannot respond to the motion for summary judgment because "no discovery was conducted in this case" and he cannot find an expert to challenge the defendants' motions. He claims, without elaboration, that the defendants' statements of fact are inaccurate, false, or misleading. He seeks further recruitment of counsel to assist him in locating an expert witness and responding to the defendants' motions.

The issues raised by the plaintiff in his affidavit have been previously addressed by this Court. (*See* Dkt. Nos. 116, 121.) The plaintiff's assertion that no discovery has been conducted in this matter is incorrect. In fact, the plaintiff's treating urology specialist, Dr. Roohollah Sharifi, a urology surgeon at the University of Illinois Medical Center, was deposed in this matter and opined that he would consider the plaintiff a candidate for a vasectomy, which at one point he thought might relieve the plaintiff's chronic and acute testicular pain. (*See* Sharifi Dep., Dkt. No.

94-5, at 54:7-57:21). However, after examining the plaintiff again (a consultation arranged by agreement with Wexford, as discussed below), Dr. Sharifi concluded that the plaintiff was ***not*** a good candidate for surgery because his complaints were too diffuse to suggest that surgery would be effective. (*See* Dkt. No. 73.) It was Dr. Sharifi's opinion that surgery is not medically indicated that ultimately prompted the withdrawal of both the plaintiff's retained counsel and counsel later recruited by the Court. (*See* Dkt. Nos. 81, 108, 116.) The plaintiff has provided no basis to question the integrity of Dr. Sharifi's medical opinion, and there is no reason to believe that further discovery, or the recruitment by the Court of another expert, or a third attorney, would make a difference in the outcome of this case.

As such, the Court denies the plaintiff's motion under Fed. R. Civ. P. 56(d) and accepts all assertions in both sets of the defendants' Statement of Material Facts as true to the extent that the facts are supported in the record. *See* L.R. 56.1(b)(3)(C); *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). Notwithstanding these admissions, the Court construes the record evidence in the light most favorable to the plaintiff.

## II.     Facts

The plaintiff has been incarcerated at Stateville since 2006. (Wexford Defs.' Stmt. [94] at ¶ 3.) Dr. Ghosh was medical director at Stateville prior to his retirement in March of 2011. (*Id.* at ¶¶ 4, 29.) Dr. Carter served as medical director at Stateville from July 25, 2011 to May 10, 2012. (Carter Stmt. [99] at ¶ 3.) Dr. Obaisi is the current medical director at Stateville. (Wexford Defs.' Stmt. at ¶ 5.) Downs-Miller was a nurse employed by Wexford at Stateville on November 18, 2012, the date of her alleged misconduct. (*Id.* at ¶ 6.) Wexford contracts with the State of Illinois

to provide health care services to inmates at Stateville. (*Id.* at ¶ 7.)

The record reflects that the plaintiff has received a long and sustained course of treatment based on his complaints of testicular pain. The plaintiff testified that he first started having testicular problems in 2006, although "really things didn't start until like 2007." (*Id.* at ¶ 12.) On August 22, 2007, the plaintiff was treated by Dr. Ghosh for his testicular pain. (*Id.* at ¶ 13.) Dr. Ghosh noted that the left testes was slightly enlarged and diagnosed the plaintiff with epididymitis.[3] (*Id.* at ¶ 14.) Dr. Ghosh prescribed the plaintiff an antibiotic, Doxycycline, a pain reliever, Motrin, and a jock strap for support and advised him to follow up in the emergency room on Sept. 7, 2007. (*Id.* at ¶ 15.) Dr. Ghosh next treated the plaintiff on October 18, 2007, at which time he noticed a small lump in the plaintiff's left testes. (*Id.* at ¶ 16.) At that time, Dr. Ghosh continued to prescribe Motrin for pain, and referred the plaintiff to UIC Medical Center for a testicular ultrasound. (*Id.* at ¶ 17.) The plaintiff underwent the ultrasound on December 13, 2007. (*Id.* at ¶ 18.)

Dr. Ghosh next treated the plaintiff on January 4, 2008, at which time he provided the plaintiff with a jock strap and Motrin, although the plaintiff testified that the Motrin was discontinued at some point because had a bad reaction to the drug. (*Id.* at ¶ 19; Pl.'s Dep., Dkt. No. 94-1, at 31:15-17.) On February 14, 2008, the plaintiff was admitted to the infirmary for observation concerning his scrotal pain, at which time he was given the antibiotics Doxycycline and Bactrim, as well as Tylenol for the pain. (Wexford Defs.' Stmt. at ¶ 20.) The next day, Dr. Ghosh saw the plaintiff in the infirmary, at which time he continued the plaintiff's prescriptions

---

[3] Epididymitis is an inflammation of the epididymis, which is the cord or tube that runs from the testicle to the prostate. (Wexford Defs.' Stmt. at ¶ 53.)

for Doxycycline, Motrin, and a jock strap, issued the plaintiff a low bunk permit, and arranged to have the plaintiff evaluated by a specialist at UIC, Dr. Roohollah Sharifi. (*Id.* at ¶ 21.)

Dr. Sharifi has been a board-certified urologist since 1978, is currently the director of the Uro-Oncology Fellowship at the University of Illinois at Chicago, and has been associated with the university for 40 years. (*Id.* at ¶ 51.) Although he is a professor of surgery in urology, Dr. Sharifi also treats patients. (*Id.* at ¶ 52.) Dr. Sharifi first treated the plaintiff on August 12, 2008, at which time he also reviewed the results of the plaintiff's December 2007 ultrasound. (*Id.* at ¶ 54.) When Dr. Sharifi saw the plaintiff on August 12, 2008, the plaintiff indicated to the nurse that he was not in any pain. (*Id.* at ¶ 57.) Based on his examination and review of the ultrasound, Dr. Sharifi diagnosed the plaintiff's condition as orchiepididymitis, or inflammation involving the epididymis and the testes. (*Id.* at ¶ 55.) The primary treatment for this condition is antibiotics, pain medication, and scrotal support. (*Id.* at ¶ 56.). Because of the small lump in the plaintiff's left testicle, Dr. Sharifi recommended an MRI to rule out a testicular tumor. (Sharifi Dep. at 18:23-19:24.)

Dr. Ghosh also examined the plaintiff on August 12, 2008, after he returned from his appointment with Dr. Sharifi. (Wexford Defs.' Stmt. at ¶ 22.) Consistent with Dr. Sharifi's diagnosis, Dr. Ghosh prescribed another antibiotic, Ciprofloxacin, to treat the plaintiff's epididymitis. (*Id.*) A follow-up examination by Dr. Sharifi was conducted on November 18, 2008. (*Id.* at ¶ 58.) At that time, the plaintiff complained of testicular pain, but there was no significant change in the plaintiff's diagnosis or condition. (*Id.*) The recommended MRI, however, had not been conducted. (Sharifi Dep. at 24:10:14.)

The plaintiff next saw Dr. Ghosh on April 7, 2009,[4] for multiple medical conditions, at which point Dr. Ghosh noted that no mass was felt in the plaintiff's left testes. (Wexford Defs.' Stmt. at ¶ 23.) Dr. Ghosh again prescribed Ciprofloxacin, discontinued Bactrim, and ordered a CT scan of the plaintiff's abdomen due to the plaintiff's complaint that there was blood in his urine. (*Id.* at ¶ 24)

Dr. Ghosh next treated the plaintiff on October 5, 2009, October 6, 2009, and October 8, 2009, at which time the plaintiff was in the infirmary for chest and abdominal pains. (*Id.* at ¶ 25.) Dr. Ghosh noted no complaints concerning testicular problems. (*Id.*) On October 13, 2009, Dr. Ghosh again treated the plaintiff in the infirmary for abdominal issues, at which time Dr. Ghosh planned a consultation with a gastroenterologist to address those issues. (*Id.* at ¶ 26.)

On February 2, 2010, Dr. Ghosh noted in the plaintiff's chart that the plaintiff had received further testing for his epigastric issues at UIC. (*Id.* at ¶ 27.) Dr. Ghosh prescribed multiple medications for this condition. (*Id.*) Dr. Ghosh next treated the plaintiff on October 10, 2010, for complaints of lower back pain, which resulted in an MRI of the plaintiff's lumbar spine, a prescription for the pain reliever Naprosyn, and a low bunk permit. (*Id.* at ¶ 28.) This was apparently the last time Dr. Ghosh treated the plaintiff. (*Id.* at ¶ 29.)

The first instance in which the plaintiff received medical treatment after Dr. Carter became medical director at Stateville was on August 9, 2011. (Carter Stmt. at ¶ 5.)[5] On that

---

[4] The plaintiff was also seen by other medical personnel on a number of occasions that are not detailed in this factual summary, which focuses on the interaction of the remaining individual defendants with the plaintiff.

[5] There is no evidence of record that the plaintiff requested but was unable to obtain medical care in the interim.

occasion, physician's assistant La Tanya Williams saw the plaintiff in connection with his complaints of lower back pain and referred the plaintiff to Dr. Carter. (*Id.* at ¶ 6.) On August 23, 2011, Dr. Carter evaluated the plaintiff in connection with his complaints of lower back pain. (*Id.* at ¶ 7.) Dr. Carter diagnosed the plaintiff with chronic musculoskeletal lower back pain, and prescribed him the pain relievers Naprosyn and Flexeril. (*Id.* at ¶ 8.) The medical records do not reflect any complaints by the plaintiff to Dr. Carter about his testicular pain.   (*Id.* at ¶ 9.)

On October 13, 2011, Dr. Carter performed a follow-up evaluation of the plaintiff in connection with his complaints of lower back and heel pain. (*Id*. at ¶ 10.) Dr. Carter ordered a heel cup, renewed the plaintiff's permits, and directed him to continue taking Naprosyn and Flexeril. (*Id.*) There is again no indication in the medical records that the plaintiff made any complaints of testicular issues on this date, although the plaintiff testified that he did tell Dr. Carter he was having pain in his testicles. (*Id.* at ¶ 11; *see* Pl.'s Dep. at 129:19-131:5.) The plaintiff acknowledged, however, that although he was having a "little pain" in his testicles, the primary reason for his visit to Dr. Carter was his heel injury. (Pl.'s Dep. at 130:18-21; 130:24-131:1.)

On January 9, 2012, Dr. Carter treated the plaintiff for the third and final time. (Carter Stmt. at ¶ 12.) On that occasion, the plaintiff complained of an upset stomach, and Dr. Carter diagnosed the plaintiff with gastritis induced by non-steroidal anti-inflammatory medication. (*Id.* at ¶ 13.) Dr. Carter directed that the plaintiff undergo laboratory blood testing, and prescribed him Prilosec and Mylanta. (*Id.*) There is no indication in the medical records that the plaintiff complained of testicular pain on this date. (*Id.* at ¶ 14.)

On April 25, 2012, the plaintiff was evaluated by a staff physician, Dr. DuBrick, in

connection with his complaints of testicular pain. (*Id.* at ¶ 15.) Dr. DuBrick diagnosed the plaintiff with recurrent acute epididymitis and possible concurrent symptomatic benign hyperplasia, or increased cell production. (*Id.* at ¶ 16.) Dr. DuBrick ordered the plaintiff to undergo laboratory testing and prescribed the antibiotic Bactrim. (*Id.*) Dr. DuBrick again examined the plaintiff on May 8, 2012. (*Id.* at ¶ 17.) After performing a physical examination, Dr. DuBrick prescribed additional antibiotics, Rocephin and Levofloxacin. (*Id.*) He also ordered a prostate antigen test to investigate whether the plaintiff had prostatitis. (*Id.*)

On May 10, 2012, Dr. Carter resigned from his position as medical director at Stateville. (*Id.* at ¶ 18.) He did not have any further involvement in the plaintiff's care. (*Id.* at ¶ 19.) It is Dr. Carter's custom and practice to note a patient's subjective complaints in the patient's medical records. (*Id.* at ¶ 20.). Dr. Carter never documented any complaints relative to the plaintiff's testicular issues in the plaintiff's medical records, from which he concludes that the plaintiff never made any such complaints to him on the three occasions he treated the plaintiff. (*Id.* at ¶ 21.) Dr. Carter is of the opinion that he and other medical personnel at Stateville provided appropriate medical treatment for the plaintiff. (*Id.* at ¶ 22.)

Dr. Obaisi succeeded Dr. Carter as the Medical Director at Stateville. (Wexford Defs.' Stmt. at ¶ 30.) After coming to Stateville on August 2, 2012, Dr. Obaisi first treated the plaintiff on August 22, 2012, for recurrent testicle pain. (*Id.*) Dr. Obaisi prescribed injections of the antibiotics Rocephin and Doxycycline. (*Id.*) Dr. Obaisi again treated the plaintiff on Sept. 12, 2012, at which time he prescribed alternate medications and ordered another ultrasound. (*Id.* at ¶ 31.) The plaintiff next saw Dr. Obaisi on October 1, 2012, at which time no changes were noted in his condition. (*Id.* at ¶ 32.) The plaintiff received the ultrasound on October 26, 2012. (*Id.* at ¶

33.) At their next appointment, on November 1, 2012, Dr. Obaisi continued the plaintiff on his testicular medications. (*Id.* at ¶ 34.)

On November 18, 2012, Nurse Downs-Miller was summoned to the plaintiff's cell to treat his complaints of testicular pain. (*Id.* at ¶ 35.) During or shortly after her visit with the plaintiff, Downs-Miller prepared a medical note concerning the treatment provided to the plaintiff. (*Id.* at ¶ 36.) The plaintiff informed Downs-Miller that he was having testicular pain, and although he was hesitant at first, he allowed her to examine him. (*Id.* at ¶¶ 37-38.) Downs-Miller examined the plaintiff, and found no visible indicators of a problem; his testes were descended and round in shape, with no visible swelling, redness, twisting, rashes, or lumps. (*Id.* at ¶ 39.) Downs-Miller encouraged the plaintiff to apply warm compresses to the area and to take Tylenol, which he refused. (*Id.* at ¶ 40.) She also instructed the plaintiff to report any changes in his condition, and advised the day nurse and medical technician of the situation. (*Id.*) Based on Downs-Miller's physical examination of the plaintiff, it was her opinion that the plaintiff's condition was a non-emergency, and that the plaintiff should be placed on the sick call for the following morning. (*Id.* at ¶ 41.) However, she also instructed the plaintiff to report any further increase in his pain. (*Id.*)[6]

The following day, November 19, 2012, Dr. Obaisi examined the plaintiff and referred

_____

[6] The plaintiff testified in his deposition that Downs-Miller made him sign a co-pay voucher but did not examine him and did not offer him Tylenol. (Pl.'s Dep. at 189:1-190:20.) He did not know if she placed him on sick call. (*Id.* at 192:3-11.) However, regardless of what treatment Nurse Downs-Miller did or did not provide, the plaintiff was seen at least twice more by nursing personnel within an approximately 12-hour period, with the results of the examination the same as reported by Downs-Miller; the plaintiff also acknowledged receiving some form of pain medication. (Wexford Defs.' Stmt. at ¶ 44; Pl.'s Dep. at 198:11-199:10.)

him to St. Joseph's Hospital, believing that he was possibly suffering from a kidney stone. (*Id.* at ¶ 45.) The plaintiff was released the next day, with no acute findings. (*Id.*) Dr. Obaisi followed up with the plaintiff on November 26, 2012, and November 27, 2012. He continued to assess the plaintiff's condition as chronic epididymitis, and Rocephin injections were resumed. (*Id.* at ¶ 46.)

On December 3, 2012, Dr. Obaisi, following a "collegial review" (Pl.'s Dep. at 207:7),[7] obtained approval for another outside consultation with a urologist. (*Id.* at ¶ 47.) After referring the plaintiff for a urology consultation, Dr. Obaisi followed up with the plaintiff on December 12, 2012, and December 17, 2012, at which time he noted that the plaintiff's epididymitis was "improving" and resolving. (*Id.* at ¶ 48.) Dr. Obaisi treated the plaintiff once more prior to the filing of the plaintiff's complaint, on January 31, 2013. (*Id*. at ¶ 49.) Dr. Obaisi has continued to treat the plaintiff for chronic epididymitis regularly since the filing of the complaint. (*Id.* at ¶ 50.)

Notwithstanding his two examinations by Dr. Sharifi in August and November 2008, in his complaint the plaintiff alleged (among other things) that "Doctors Zhang, Ghosh, Carter and Obaisi, and others . . . refused to examine, diagnose or have his testicle illness diagnosed by a specialist or consultant." (Pl.'s Compl., Dkt. No. 7, at ¶ 28.) Dr. Sharifi examined the plaintiff for a third time in February 2013 pursuant to Dr. Obaisi's December 2012 referral. (Sharifi Dep. at 32:10-12). As a result of this examination, Dr. Sharifi believed that excision of the small mass in the plaintiff's left testicle was indicated both to rule out cancer and as a possible means of alleviating the plaintiff's pain. (*Id*. at 33:16-34:9, 60:20-61:1.) Dr. Sharifi conducted a follow-up examination on July 2, 2013, however, and concluded that surgery was no longer indicated to

---

[7] The record does not reflect what was required for, or who was involved with, this review of the plaintiff's condition.

rule out cancer because he deemed the lack of growth in the mass to be inconsistent with testicular cancer. (*Id*. at 43:15-44:3 and Sharifi Ex. 8.)[8] He opined, however, that a vasectomy might alleviate some of the plaintiff's pain by disconnecting a possible pathway of bacteria from the urethra to the epididymis. (*Id.* at 50:9:13, 54:11:15).[9] Dr. Sharifi also opined that periodic injections of Rocephin—an antibiotic that had previously been prescribed for the plaintiff—could be a helpful treatment for the plaintiff's bouts of epididymitis. (Wexford Defs.' Stmt. at ¶ 62.) Based on what he knew of the other physicians' treatment of the plaintiff, Dr. Sharifi had no criticism of the treatment they had provided to the plaintiff. (*Id.* at ¶ 63.)

Dr. Sharifi's testimony that a vasectomy might be indicated as a means of relieving the plaintiff's pain prompted the plaintiff's counsel to file a motion for a preliminary injunction requiring Wexford to arrange for a surgical consultation with Dr. Sharifi. (Dkt. No. 62.) Ultimately, the defendants agreed to this consultation and, further, to abide by Dr. Sharifi's determination of whether surgery was indicated. (Dkt. No. 68.) When Dr. Sharifi examined the

---

[8] Dr. Sharifi did not have the results of the October 2012 ultrasound during his two 2013 examinations of the plaintiff. During his deposition in February 2014, however, Dr. Sharifi reviewed the October 2012 ultrasound results and concluded that the test confirmed that the mass resulted from an enlarged epididymis (therefore non-cancerous) rather than a testicular growth (which would have indicated a high likelihood of cancer) and that an MRI was not needed. (Wexford Defs.' Stmt. at ¶¶59-60; Sharifi Dep. at 19:3-21, 28:19-29:11.)

[9] Although no such allegation is included in his complaint, the plaintiff testified in his deposition that Dr. Sharifi told him years earlier ("in 2009") that he needed surgery. (Pl.'s Dep. at 210:12-15; "He told me that like in 2009."). Somewhat inconsistently, the plaintiff represented in response to written discovery that Dr. Sharifi had told him in February 2013 that he should have had surgery three years earlier. (Dkt. 94-5 at Ex. 7.) Dr. Sharifi testified, however, that he had never told the plaintiff that he should have surgery before February 2013 and had never considered surgery to be indicated before that time. (Wexford Defs.' Stmt. at ¶ 61; Sharifi Dep. at 35:2-37:8.)

13

plaintiff in April 2014, however, he concluded that, in fact, surgery for the plaintiff was not indicated. (Dkt. No. 73, at ¶ 6-8 and Exs. C and D thereto.)[10] This determination prompted the plaintiff's retained attorney to conclude that he could not in good faith press the plaintiff's claims further and counsel was permitted to withdraw. The Court subsequently recruited new counsel for the plaintiff, who similarly sought and was granted leave to withdraw after reviewing the discovery in the case. (*See* Dkt. Nos. 86, 108, 112,114.)

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255.

The parties seeking summary judgment have the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010). If the moving parties demonstrate the absence of a disputed issue of material fact, "the burden shifts to the non-moving party to provide evidence

---

[10] The paragraph that should be number 8 in this pleading is misnumbered as a second paragraph "6."

of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The non-movant must go beyond the pleadings and "set forth specific facts showing there is a genuine issue for trial." *Hannemann v. Southern Door County School Dist.*, 673 F.3d 746, 751 (7th Cir. 2012). A genuine issue of material fact exists only if there is evidence sufficient "to permit a jury to return a verdict for" the non-moving party. *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849 (7th Cir. 2010).

The Eighth Amendment's proscription against cruel and unusual punishment "safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Accordingly, 'deliberate indifference to serious medical needs' of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Roe*, 631 F.3d at 857 (quoting *Estelle*, 429 U.S. at 104).

A deliberate indifference claim consists of both an objective and a subjective element. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). An inmate must be able to establish both: (1) he suffered an objectively serious medical condition, and (2) defendants acted with deliberate indifference to that condition. *Id.* As to the first prong, a condition is sufficiently serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe*, 631 F.3d at 857 (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). As to the second prong, the plaintiff must prove that the defendants acted with a "sufficiently culpable state of mind," *i.e.*, that they knew of a serious risk to the inmate's health, but disregarded it. *Roe*, 631 F.3d at 857 (quoting *Greeno*, 414 F.3d at 653); *see also Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006). Something more than

negligence or medical malpractice is required. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)).

Although a prisoner may demonstrate deliberate indifference through a showing that the treatment he received was "blatantly inappropriate," such a showing is difficult to make. *Pyles*, 771 F.3d at 409 (internal quotation omitted). "[A] medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)). Disagreement between a prisoner and his doctors about the proper course of treatment is insufficient, by itself, to establish an Eighth Amendment violation. *Id.* (citing *Doughty*, 433 F.3d at 1013). A doctor's decision to pursue a particular course of treatment does not amount to deliberate indifference unless it represents so significant a departure from accepted professional standards that it calls into question whether the doctor actually was exercising his professional judgment. *Id.* (citing *Roe*, 631 F.3d at 857).

## ANALYSIS

The crux of the plaintiff's complaint is that the defendants did not properly treat his testicular condition, causing him to suffer unnecessary pain. While the Court is sympathetic to the evident fact that the plaintiff suffers from a chronic and often painful condition, he has not shown that any defendant was deliberately indifferent to his condition. To the contrary, the record demonstrates that numerous medical professionals have attempted conscientiously to address the plaintiff's condition in a wide variety of ways. That course of treatment has been endorsed by Dr. Sharifi, an independent and well-credentialed outside urological consultant. The only potential treatment Dr. Sharifi identified that the defendants had not pursued is surgery, but even Dr. Sharifi

ultimately concluded that the plaintiff is ***not*** a candidate for surgery. Accordingly, there is no basis to conclude that the treatment that the plaintiff has received for his testicular condition has been inadequate, much less deliberately so. Therefore, it is appropriate to grant the defendants' motions for summary judgment.

As a preliminary point, the defendants concede for the purposes of their motion that the plaintiff's epididymitis constitutes a serious medical condition, and the Court will assume it to be one as well. *See Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (a medical condition is serious if the failure to treat it could result in further significant injury or the unnecessary infliction of pain). A court examines the totality of an inmate's medical care in determining whether prison officials have been deliberately indifferent to a prisoner's serious medical needs. *Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999).

Examining the totality of care in this case, the plaintiff has received regular and appropriate treatment for his testicular condition (the record reflects some three dozen or more examinations and reviews relating to this condition alone), including the provision of non-prescription and prescription painkillers, the use of an assortment of antibiotics, scrotal support, multiple ultrasounds, and multiple referrals to an outside specialist. These steps spanned the tenures of Drs. Obaisi, Carter, and Ghosh as the Stateville medical directors. It is clear that the plaintiff is frustrated by his chronic pain and is willing to try anything that might provide relief, but there is no evidence of, or reason to believe, that there is a medically indicated course of treatment that the defendants have unreasonably refused to provide. The only possible alternative treatment that is even suggested by the record is surgery, but an independent outside specialist, Dr. Sharifi,

examined the plaintiff and determined that he was not a good candidate for surgery.[11]

Further, even if another medical professional would have chosen a different course of treatment, a difference of opinion between treaters would not amount to deliberate indifference. *See Steele v. Choi,* 82 F.3d 175, 179 (7th Cir. 1996). The Eighth Amendment does not provide inmates with a right to specific care, or the best care possible. *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). "There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter,* 541 F.3d 688, 697 (7th Cir. 2008). Dr. Sharifi recommended the same course of treatment (scrotal support, antibiotics, and pain medication) that the defendant doctors have been prescribing, and it cannot be credibly argued that this highly experienced professor of urology is not a "minimally competent" professional. Dr. Sharifi's opinions therefore doom the plaintiff's claim; even were he to obtain a medical opinion that surgery or some other course of treatment ought to have been pursued, the plaintiff cannot, in light of Dr. Sharifi's testimony and opinions, establish that "no minimally competent" professional would have agreed with the course of treatment provided by the defendants. The plaintiff has not demonstrated (and cannot) that any of the defendants' treatment

---

[11] As noted in a prior ruling of the Court, Dr. Sharifi is not, as the plaintiff has most recently characterized him, the "defendant's expert" and there is no basis to credit the plaintiff's unsupported charge that Dr. Sharifi "conspired" with the defendants to deny him medical care. (*See* Dkt. No. 116.) Dr. Sharifi is no shill for the defendants; it was Dr. Sharifi's initial suggestion in February 2013 that surgery might be indicated that initially gave life to the plaintiff's efforts to obtain surgery. At that stage, the plaintiff described him as "plaintiff's consulting urologist." (Dkt. No. 62, ¶¶ 1, 5.) The plaintiff was quite content to have Dr. Sharifi's determination govern the future course of his treatment—until that determination was unfavorable to him. He has provided no basis to question the integrity of Dr. Sharifi's medical opinion regarding his condition, which is entirely consistent with the prior assessments of defendants Ghosh and Obaisi.

decisions fell below the accepted standard of care, much less amounted to deliberate indifference.

Further, in regard to Dr. Carter, the record reflects that Dr. Carter was not involved in the treatment of the plaintiff's epididymitis. Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, "to be liable under [Section] 1983, an individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Village of Oak Park,* 430 F.3d 809, 810 (7th Cir.2005) (citations omitted). At best, and construing the record in the light most favorable to the plaintiff, the plaintiff can establish that he told Dr. Carter that he was experiencing testicular pain during a visit that was for the primary purpose of addressing a different health issue. By his own description, however, the plaintiff was experiencing only "a little pain." There is no evidence that Dr. Carter was aware of, much less disregarded, a serious risk to the plaintiff's health. This is particularly true given the fact that during Dr. Carter's tenure, the plaintiff received treatment for his testicular problems from Dr. DuBrick. As did the defendant doctors, Dr. DuBrick prescribed antibiotics and ordered laboratory testing to address the plaintiff's complaints. The plaintiff does not allege any inadequacies in the care provided by Dr. DuBrick, who is not a party to this lawsuit.

In regard to Nurse Downs-Miller, the plaintiff cannot establish deliberate indifference based on her assessment of a co-pay charge required by the institution. *See Hightower v. Godinez*, 524 Fed. App'x 294, 296 (7th Cir. 2013). As noted at the outset, the plaintiff failed to properly dispute the defendants' statement of facts as to Nurse Downs-Miller's actions and, in any event, while the plaintiff contended in his deposition testimony that Nurse Downs-Miller failed to examine him, the undisputed medical evidence shows that the plaintiff was seen twice more by nurses within an approximately 12-hour period following his encounter with Nurse Downs-Miller,

so it is also plain that Downs-Miller did not significantly delay further treatment of the plaintiff. At that time, the plaintiff received pain medication and an appointment with Dr. Obaisi was scheduled for the next day. (*See* Pl.'s Medical Records, Dkt. No. 94-4, at 40-42.) In fact, after the plaintiff stated that he was throwing up blood and that the pain pills he had received the night before had made him sick, the nursing staff offered to allow the plaintiff to come to the Health Care Unit to await his appointment with Dr. Obaisi. (*Id.* at 42.) The plaintiff declined. (*Id.*) In light of this record, the plaintiff cannot show that he suffered any harm as a result of Nurse Downs-Millers' actions or inactions. Therefore, she is entitled to summary judgment.

Finally, as to Defendant Wexford, the Court analyzes a Section 1983 claim against a private corporation using the same principles applied to such claims against a municipality. *Brown v. Ghosh*, No. 09 C 2542, 2010 U.S. Dist. LEXIS 103992, *25 (N.D. Ill. September 28, 2010) (citing *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 822 (7th Cir. 2009)). In particular, there is no *respondeat superior* liability under Section 1983. *Rodriguez*, 577 F.3d at 822; *see Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789-96 (7th Cir. 2014) (questioning this rule in the context of private corporations, but noting that it remains the law). Rather, a private corporation cannot be held liable under Section 1983 unless the constitutional violation was caused by an unconstitutional custom or policy of the corporation itself. *Shields*, 746 F.3d at 789. Such liability may be demonstrated directly through a showing that the policy itself is unconstitutional, or indirectly by showing a series of bad acts on behalf of the corporation, thus inviting the court to infer that the policymakers noticed misconduct and failed to act, encouraging or condoning such misconduct. *Estate of Novack v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000).

While the plaintiff alleged that Wexford's cost-saving policies deprived him adequate care, he has produced no evidence to this effect; indeed, as noted, the plaintiff was referred at least three times to Dr. Sharifi, the outside specialist, who had no criticism of the course of treatment that the Wexford staff had followed. Further, because the plaintiff has not established that any individual defendant was deliberately indifferent to his serious medical needs, he cannot recover against Wexford. *See Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013) (holding that where plaintiff had not established a constitutional problem with his treatment, he did not suffer an actionable injury from the policy he attributed to the corporation).

## CONCLUSION

For the foregoing reasons, the plaintiff's "Affidavit Pursuant to Fed. R. Civ. P. 56(d)," which the Court interprets as a motion for additional discovery pursuant to Fed. R. Civ. P. 56(d) (Dkt. No. 125) is denied. The Wexford Defendants' motion for summary judgment (Dkt. No. 95) is granted, as is Dr. Carter's motion for summary judgment (Dkt. No. 97). Final judgment will be entered. If the plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). If the plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). If the appeal is found to be non-meritorious, the plaintiff could be assessed a "strike" under 28 U.S.C. § 1915(g). If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he is in imminent danger of serious physical injury. *Ibid.* If the plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to

proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1).


DATE: <u>1/12/2016</u>

_____
John J. Tharp, Jr.
United States District Judge